# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION V. ERMA M. HITE.

November 19, 1945.

Record No. 2950.

Present, All the Justices.

The opinion states the case.

*Bohannan & Bohannan,* for the plaintiff in error.

*J. Segar Gravatt,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Erma M. Hite brought this action to recover the sum of $2,250, the amount of a policy of insurance issued by the Mutual Benefit Health & Accident Association, hereinafter referred to as the defendant or insurer, to Grove Hite, payable to Erma M. Hite, his widow, in the event of his death by accident. A trial by jury was had and resulted in a verdict for the plaintiff, which verdict the trial court affirmed.

We are asked to reverse the judgment as contrary to the law and the evidence, and because of the failure of the trial court to give certain instructions requested by the defendant.

The pertinent provisions of the insurance policy, so far as material here, insured Grover Hite against "loss of life, limb, sight, or time, sustained or commencing while this policy is in force, resulting directly and independently of all other causes, from bodily injuries sustained while this policy is in force, through accidental means * * * ."

There was a further provision for the payment of specific disability benefits for bodily injuries sustained under the same provisions and limitations, which need not be set out here.

It is the contention of the defendant that the evidence does not support the verdict, in that it failed to establish that the death of Hite resulted from accidental inhalation of chlorine gas "independently or exclusively of disease and all other causes". It is not claimed that it was incumbent upon the plaintiff to eliminate every cause that might be suggested by the imagination as a possible contributory cause of the death of the insured; but it is claimed that since there was some evidence which pointed to a pre-existing disease of influenza as a contributing cause, the existence of that disease must be eliminated.

In support of its contention, the defendant has, in its brief, made a comprehensive and critical analysis of all the evidence. It must be remembered, however, that in view of the jury's verdict, it is only necessary for us to consider the evidence in the light most favorable to it. All conflicts, if any, must be resolved in such favor, and if, as a result, there is evidence to sustain the verdict it must stand.

Grover Hite was forty-nine years old at the time of his death. He was six feet tall, weighed approximately one hundred and seventy-five pounds, and throughout his life had been a man of robust health. He was employed at the time of his death at the water reservoir at Camp Pickett, Virginia, as a pump operator. In the pump house was located certain machinery and equipment to feed chlorine gas into the water for the purpose of purification. Hite reported to work at twelve o'clock midnight Friday, August 27, 1943, to perform his duty of keeping the pumps running and the chlorinator operating.

Grady Jones, who was relieved by Hite on that night, testified that the chlorinator had not been operating properly, and that it had become clogged and the gas would escape. This made it necessary for the operator to go down and

cut off the chlorinator from time to time. Jones warned Hite to watch the machinery because it was not working properly, and he was unable to fix it. He next saw Hite about eight-thirty o'clock in the evening of August 28th, waiting in front of the office of Dr. J. M. Hurt in Blackstone, and Hite told him at the time he was sick and wanted to see the doctor.

At three o'clock a. m., August 28, 1943, Private Angelo Semenza, who was on guard and patrol duty at the reservoir and water plant, in making one of his hourly rounds, went into the pumping station and found Hite asleep in a chair. Semenza gave the following description as to what then happened:

"A. When I went in there at 3 o'clock, the place was full of chlorine gas, and Mr. Hite was seated in the chair. Of course, he was asleep at the time, and I woke him up, and we both came outside of the pumping station, and he started to coughing, and vomited too. After a little while he went back in the pumping station and shut the chlorine tank off, because it was out of order. Then he came outside. I remember him saying outside the rest of the night, until he was relieved of his duty in the morning.

"Q. Mr. Semenza, when you went into the pumping station there at 3 o'clock, how far had you gone into the pumping room before you noticed this chlorine?

"A. The minute I walked in the door I noticed it.

"Q. Was the smell of this chlorine gas mild, or strong, or how was it?

"A. Very strong, I should say.

"Q. Did you immediately go in to Mr. Hite or not?

"A. I ran out and put a handkerchief over my nose.

"Q. After you had done that, what did you do?

"A. I went back in there to look after Mr. Hite and woke him up.

"Q. How long was it after you woke Mr. Hite before he began to cough?

"A. The minute he got up off that chair he started to coughing.

"Q. How long did he continue to cough and vomit?

"A. I should say about fifteen minutes. After that he kept coughing continuously."

Mrs. Hite testified that her husband reached home between eight-thirty and nine o'clock on the morning of August 28th. He had driven his car from the power plant or from the office of Dr. Hurt in Blackstone, where Grady Jones said he saw him about eight-thirty o'clock that morning, waiting for the doctor. Mrs. Hite said that she noticed when Hite came up the steps he looked pale, his face was drawn and white, whereas he had always been "rosy". She asked him what was the matter, and he said he felt badly. He came in and ate his breakfast, and "laid around" all that day. That afternoon he was complaining and she insisted he go to see the doctor "because he didn't look right", and she knew that there was something wrong with him. He coughed continuously. He made no mention to Mrs. Hite of the fact that he had inhaled gas at the pumping station. He was a reticent man, and was not accustomed to telling his troubles to any one. He went to see Dr. Hurt that afternoon in Blackstone, a short distance from his home at Camp Pickett. When he returned home, "He was holding on the banister and still looking white and I asked him what was the matter and he said the doctor said he had the flu and go to bed and he would be all right." Hite went to bed and continued to get progressively worse. Tuesday, August 31st, Dr. Hurt was called again. Hurt arrived about two p. m., and Hite was in such bad shape at that time that the doctor said he "didn't notice anything hardly and just laid there and couldn't get his breath and restless." That evening his respiration was very rapid, his temperature began to drop, and he died of pneumonia about seven p. m. His fever was very high until its drop just before his death.

Mrs. T. A. Clark, a neighbor, testified that when she saw Hite on Monday and Tuesday, August 30th and 31st, he was very sick, his complexion was very pale, and he was rolling and tossing on his bed.

Miss Virginia Rucks, also a neighbor, said that she saw him about an hour and a half before he died, and that he was extremely ill and his complexion was "terrible, a kind of bluish-gray."

James Eastwood testified that he saw him on Sunday and Monday nights, and that on both occasions "he looked awful pale."

Garland Wilkinson, the undertaker who prepared Hite's body for burial, testified "The body was right much discolored, especially in the extremities, that is, the face, ears and neck, and down across part of the chest and the fingernails were dark and splotches all over the body. It was approximately the color of a damson." He defined the color of damson as being a kind of bluish-black. He said that he had embalmed two other bodies of persons who had died of chlorine gas poisoning, and those bodies did not have as much discoloration as there was in the body of Hite. He further said that the blood which he removed from the body of Hite "was very thick and dark and considerable clots."

The record does not show that Hite knew anything of the effects of inhaling chlorine gas, and in any event he did not mention the gas to his wife or Dr. Hurt.

Dr. Hurt said that he saw Hite in his office about five o'clock on Saturday afternoon, August 28th. He did not consider Hite very sick at that time. He had a tightness in his chest, was perspiring a little bit, and pulse right fast. He was pale and ashy looking. Dr. Hurt was quite a busy man. He and another white doctor were serving the community, which, due to war conditions, had a population five times greater than normal. There were "quite a few cases" of influenza in the community at that time. He had never had a case of chlorine gas poisoning under his care before. His then impression was that Hite was suffering from influeza. In answer to the question, whether he made any specific inquiry of Hite in regard to his sickness, he replied, "I don't know whether I inquired. I asked him had he been sick, and it seems to me he said he had been feeling bad for

a day or two. Whether I assumed that because he came in with what apparently seemed to be flu or whether he actually told me that I don't know. I just don't remember."

Subsequent events, later information and the extremely ill condition of Hite on Tuesday caused Dr. Hurt to become doubtful of his original diagnosis. Relative to these circumstances, he expressed his opinion as follows:

"Q. What, Doctor, was your reaction to what you found in comparison to what you had found when Mr. Hite first came to your office?

"A. To tell you the truth, I was very surprised. Flu cases don't do that and I just didn't know what to say. I listened to his heart and he had no pain around his heart and I couldn't hear anything in the world wrong about his heart rather than the accelerated rate—no murmurs, no sign of decompensation whatever. I examined his chest and he had pronounced rales, that is crackles throughout his whole chest."

\*       \*       \*       \*       \*       \*       \*

"Q. And you did not know that (referring to inhalation of chlorine gas) until after he had died and so you didn't, as long as he was living, at least, observe any outward symptoms of chlorine gas?

"A. Oh, yes, I observed the symptoms, now that I know what the symptoms are.

"Q. You didn't see anything sufficient to make you suspect chlorine gas?

"A. I suspected that I was not entirely right in my diagnosis when I saw him on Tuesday afternoon.

"Q. Did you question him about whether there could have been some other—

"A. No, he was too sick to question Tuesday afternoon when I saw him.

"Q. That was the first time you might have suspected there was something other than influenza present; is that right?

"A. Yes. I very strongly suspected it was something other than simple influenza on Tuesday afternoon."

\*        \*        \*        \*        \*        \*        \*

"Q. How long would be required after the exposure to the gas for influenza to develop?

"A. I don't know. If he was exposed to influenza, I expect he could develop symptoms of influenza immediately, within two hours.

"Q. If he had influenza when he came to your office—

"A. He had symptoms of influenza and the symptoms of mild influenza and a mild exposure to chlorine poisoning are very, very similar."

\*        \*        \*        \*        \*        \*        \*

"Q. In your opinion, from all the facts, and refreshing your memory, would you say that the influenza which this man appears to have had at the time he was gassed may have been a contributing cause of the pneumonia?

"A. Since reading all of these six volumes that I have read on chlorine poisoning, I am very doubtful whether he had any influenza at all but I knew he had pneumonia.

"Q. Didn't you state just now—

"A. I think he probably had but there is considerable doubt, considerable more doubt than there was before I read these volumes."

Dr. Hurt stated the results of his investigation as to the symptoms and effects of chlorine gas upon the human body, and said that the condition and reactions of Hite, described by Mrs. Hité, and the discoloration of the body of the decedent correspond to his later findings that Hite died of chlorine gas poisoning. He expressed the opinion that the inhaling of chlorine gas was the controlling cause of the death of Hite, and added, "I mean if he hadn't got the gas he would still be working at Camp Pickett, I expect."

Dr. Bernard Black-Schaffer, a witness for the plaintiff, and Dr. Hurt both testified that bacteria of influenza and of pneumonia are frequently present in the respiratory tract of human beings, and may be perfectly harmless; but that when

chlorine gas is breathed by persons having those germs present, the germs, otherwise harmless, bring on a dangerous infectious disease.

They agreed that the symptoms manifested by Hite from Friday night until the time of his death and the condition of his body thereafter were characteristic symptoms and conditions of chlorine gas poisoning. They also were of opinion that if Hite had influenza before inhaling the gas, it might have been a contributing cause of his pneumonia.

Dr. Black-Schaffer, who heard all of the evidence, further testified: "If there were no antecedent infection whatever, I would say that everything that has been described is consistent with chlorine gas poisoning."

Attention was called to Dr. Hurt's statement in his affidavit as attending physician, presented with the claim for the death benefit, where in answer to the question, "What was the nature and extent of the injuries?", he said "Pneumonia as result of influenza, plus the inhalation of chlorine gas."

Dr. Hurt explained that the first knowledge he had of the inhalation of gas by Hite was sometime after his death when James Eastwood brought him the insurance papers, gave him information of the gas poisoning, and asked what to do about the policy of insurance. He said he then informed himself of the facts, consulted the authorities, and came to the conclusion stated in his testimony. In other portions of his testimony, he expressed his uncertainty as to whether or not Hite had influenza before he inhaled the gas. At no time was he positive that Hite did have such an illness before or after he inhaled the gas.

Mrs. Hite said she saw her husband all day before he inhaled the gas, and had seen him throughout the previous week, and that she had observed nothing about his physical condition to indicate that he had a cold or influenza or any kind of disease whatsoever; that he had not been sick since they were married in January, 1943; and that he had been going to his work regularly until the 28th of August.

Grady Jones and Mrs. T. A. Clark saw Hite on the day

before he inhaled the gas and testified that he was a healthy, robust man, and from their observation, he had no cold, influenza, or other disease. John Eastwood played set-back with Hite on Thursday night before he inhaled the gas, and observed no sign of illness. Semenza, during the four or five months that he had been on duty at the reservoir, said he had formed a friendly acquaintance with Hite through calls to the pumping station every hour to make his reports; that on the night in question he talked with Hite at two o'clock without noticing anything unusual about him; that Hite had not complained to him; and there was nothing to indicate that he was feeling badly prior to his three o'clock a. m. call.

The trial court gave four instructions, two at the request of the plaintiff and two for the defendant. The first instruction related to a defense which has been abandoned. The other three instructions, given without exception, and which constitute the law of the case, are as follows:

(2) "The Court instructs the jury that if you believe from the evidence in this case that the policy sued on was issued by the defendant company, and that while said policy was in force, the deceased unintentionally inhaled chlorine gas and that such inhalation was the sole proximate cause of his death, then you will find for the plaintiff Erma M. Hite in the sum of $2,250.00 with interest thereon from the 31st day of August, 1943."

(A) "The Court instructs the jury that if you believe from the evidence that, at the time that he inhaled chlorine gas, Grover Hite had influenza or a similar ailment and that such pre-existing influenza or similar ailment, plus accidental inhalation of chlorine gas, combined to cause the attack of pneumonia from which Grover Hite died, then the death of the said Grover Hite did not result from such accidental inhalation of chlorine gas, independently and exclusively of disease and all other causes, within the meaning of the policy sued on, and there can be no recovery by the plaintiff."

(B) "The Court instructs the jury that the burden rests upon the plaintiff to prove that the inhalation of chlorine gas by Grover Hite was sufficient to cause death as a result, and that such inhalation of gas did in fact produce death independently of any other preexisting concurring cause. Unless, therefore, you believe from the evidence that no preexisting cause other than inhalation of chlorine gas contributed to the death of Grover Hite, there can be no recovery by the plaintiff."

The legal principles applicable to this case are set out in the recent case of *Crowder* v. *General Accident, Fire, etc., Corp.*, 180 Va. 117, 21 S. E. (2d) 772, where Mr. Justice Eggleston approved the following statement from 29 Am. Jur., Insurance, Section 996, p. 750: " * * * if the insured is afflicted with a disease or infirmity at the time an alleged accident occurs, which disease or infirmity proximately causes or substantially contributes to the death or injury resulting, such death or injury is not within the coverage of a policy which insures against death or bodily injury independently of all other causes by accident or accidental means, * * * ."

The pertinent provision of the policy under review makes the insurer liable for death "resulting directly and independently of all other causes from bodily injuries sustained * * * through purely accidental means". Instruction number 2 states the requirements for recovery fully in accord therewith. It required the plaintiff to prove that the accident was the "sole proximate cause" of Hite's death. The defendant did not object to this instruction and manifestly it had no just right to complain.

Instructions "A" and "B" clearly and fully set out the defendant's theory of the case. They could not have been misunderstood. In fact, "A" is rather favorable to the defendant. It includes the words "or a similar ailment", when there was no evidence of any illness similar to influenza.

Was there sufficient probative evidence to show that Hite, at the time of the accident, was suffering from influenza? Did the evidence show that Hite inhaled sufficient chlorine

gas to cause his death and did such inhalation, in fact, produce his death, independently of any other pre-existing and concurring cause? Both of these questions were clearly and directly submitted to the jury by the instructions, and by them fully determined.

No one suggested the pre-existence of influenza as a possibility or probability except Dr. Hurt. He very fully and carefully explained the circumstances under which he made his original diagnosis, and upon his subsequent reflection, study, and examination of all the circumstances, equally as fully and carefully destroyed the effect of that diagnosis.

There was no conflict in the evidence. The only conflict was the uncertainty which arose in the mind of Dr. Hurt, under the circumstances described by him, a confusion which he sought to clear up. There was no further evidence of a preexisting illness; but there was evidence that there was none.

The evidence of Dr. Hurt, and that of the lay witnesses, was entitled to such weight as the circumstances justified, after giving consideration to their apparent intelligence, experience, and the suitable opportunity to know whereof they spoke. It was the duty of the jury to weigh the original and subsequent opinions of Dr. Hurt in the light of the inferences and assumptions upon which he based them, and to give them such weight as they thought them entitled to. The evidence, both medical and lay, amply supports the conclusion that chlorine gas poisoning was the sole proximate cause of Hite's death.

The plaintiff was charged with the affirmative duty of showing that the death of Hite was within the general coverage of the policy of insurance, that is, within the limitation of the risk therein covered. She was not charged with the almost impossible duty of negativing all latent or possible causes which might or might not have contributed, directly or indirectly, to the death of the insured. The attempt to show that the decedent had influenza did not rise above the level of conjecture or suspicion.

On the question as to who has the burden of proof on the

issue, whether the death insured against under an accident policy, with coverage similar to the one under review, was contributed to by a pre-existing disease or other bodily injury, the authorities are decidedly in conflict, and there is a great contrariety of decisions. We refer the interested reader to the Annotations on that subject in 131 A. L. R. 240, 142 A. L. R. 742, 144 A. L. R. 1416, and cases therein cited, and to 29 Am. Jur., Insurance, sections 932, 996, and 1444.

The trial court did not err in refusing to give two other instructions requested by the defendant. In these instructions, the defendant sought to have the court tell the jury, that, if they believed from the evidence that the failure of Grover Hite to consult a physician promptly, or disclose to his attending physician the fact that he had inhaled the gas, or to take such steps to avoid the effects of the inhalation as a reasonable, prudent person would have done under similar circumstances, was or might have been a contributing cause of his death, there could be no recovery. There is no evidence in the record that Hite's life could have been saved by some method of treatment which might have been given. The question should not be left to the pure conjecture of the jury. In the second place, the insurance contract does not contain any provision excepting liability because of failure to consult a physician or to make a complete or full disclosure to him.

In 29 Am. Jur., Insurance, section 942, it is said:

"Recovery on an accident insurance policy is not defeated by the mere fact that negligence of the insured contributed to the injury, unless the policy expressly excepts from the risk accidents due to the negligence of the insured."

We agree with the jury and the trial court that there was sufficient evidence to show that the death of Hite resulted directly and independently of all other causes from bodily injuries sustained through accidental means. It follows that the judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*