# Richmond

STERLING INSURANCE COMPANY V. GRACE DUFF GRANT.

December 2, 1957.

Record No. 4691.

Present, All the Justices.

The opinion states the case.

G. R. C. *Stuart* (*Penn, Stuart & Phillips*, on brief), for the plaintiff in error.

No brief filed for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

■ Grace Duff Grant, hereinafter referred to as the plaintiff, filed a motion for judgment against the Sterling Insurance Company to recover certain disability benefits alleged to be due under the terms of an insurance policy issued to her on December 29, 1949. The plaintiff alleged that under the provisions of the policy she was entitled to the benefits sued for in that on October 30, 1953, she was wholly and permanently disabled solely as the result of accidental injuries sustained while she was a passenger on a train operated by the Norfolk & Western Railway Company. The Insurance Company denied liability under the terms of the policy for the claimed benefits. There was a jury trial which resulted in a verdict for the plaintiff upon which the trial court entered judgment.

On this writ of error granted the Insurance Company we are asked to reverse the judgment because, it is said, the verdict is unsupported by the evidence and the trial court erred in excluding certain evidence offered by the defendant and in its rulings on the instructions to the jury.

Under the provisions of the policy, disability benefits were payable for "bodily injury * * * which is effected solely through accident while the policy is in force" and while the insured is "wholly and continuously" disabled. The sufficiency of the evidence is challenged upon the ground that it fails to show that the plaintiff's disability was "effected solely" through the injuries sustained in the train accident of October, 1953, and that it shows that such disability was effected or brought about, at least in part, by injuries which she had sustained in an automobile accident in 1932.

Under well-settled principles, because of the favorable verdict,

we test the sufficiency of the evidence on this issue in the light most favorable to the plaintiff. *Mutual Benefit, etc., Ass'n.* v. *Hite*, 184 Va. 614, 617, 35 S. E. 2d 743, 744.

On October 30, 1953, a Norfolk & Western train on which the plaintiff was a passenger ran into the rear of a train ahead. As the result of the collision the plaintiff was thrown from her seat, suffered a fracture of the left seventh rib, a fracture of the sternum, and contusions on the chin, neck and back. She was taken to a hospital in Abingdon where she remained for about two weeks.

The attending physicians at the hospital diagnosed the plaintiff's injuries as "minor" and without permanent disability. However, on the fourth day after her admission she became hoarse. This condition became progressively worse until she spoke only in a whisper. Since leaving the hospital this condition has persisted and at the time of the trial she could not speak above a whisper. While she testified that she still suffered pain from her other injuries, the physicians agreed that her fractures had healed and they could find no objective cause for her continued suffering.

At the time of the train accident the plaintiff was and had been for a number of years employed as a teacher in the public schools of Washington county. While she had recently been under treatment for laryngitis that condition had improved and had not caused her to lose any time from her work. Since this accident and mainly because of the loss of her voice she has been unable to resume her teaching. Although, as we shall see, the physicians disagreed as to the cause, there seems to be no disagreement that she was at the time of the trial in fact "wholly" disabled because of the loss of her voice.

The evidence further discloses that in 1932 the plaintiff was severely injured in an automobile accident. She had a basal skull fracture, suffered a severe brain injury, and remained unconscious for nineteen hours. As the result of that accident the right side of her face was permanently paralyzed and her right eye was crossed or "turned in" and useless. Following that accident she was confined to her bed for about ten months and was unable to follow gainful employment for some twelve years.

The plaintiff testified that except for the facial paralysis and the condition of her right eye she had fully recovered from the injuries which she received in the automobile accident of 1932 and the disability which resulted therefrom. In this she was corroborated by

the testimony of members of her family and other lay witnesses.

Subsequent to the train accident and down to the date of the trial the plaintiff was examined and treated by a number of physicians. But only Drs. F. B. Stuart and J. B. Lawrence, who testified in her behalf, and Drs. C. F. Johnston, Jr., Harry Hayter and Harry Myron, Jr., who testified for the defendant, gave testimony pertinent to the narrow issue whether the plaintiff's disability was caused by injuries "effected solely" through the train accident.

The testimony most favorable to the plaintiff on this issue was that of Dr. Stuart, a general practitioner. He testified that he first examined the plaintiff in October, 1954, about a year after the train accident. From that time until the date of the trial, in March, 1956, he had been treating her "on the average of once a week." His examination and treatment were in the light of her "traumatic history," she having told him of her injuries sustained in the train accident. In addition to fractures of her rib and sternum he found that she had "lost her voice," "had an imbalance," "walked haltingly and with difficulty," and that her seventh cervical vertebra was "rotating slightly to the right." During his continued treatment her condition grew "progressively worse," and at the time of the trial she was, in his opinion, "totally and permanently disabled" and unable to carry on a "vocation for wages."

As to the cause of her disability he testified thus:

"Q. Now assuming, Doctor, she was able to carry on her avocation as a school teacher, and was teaching on the day of this accident, and had been teaching for a period of time, and doing the ordinary household duties a lady would do, and assuming that after this accident in three or four days she lost her voice and had this pain and suffering she described, what, in your opinion, caused her present condition?

"A. From her traumatic history and injury she sustained at the time of the accident.

"Q. The train wreck?

"A. Yes, sir, because she was able to walk and talk and I am taking her word for that, and she lost her voice, I think she said within a day or two, I think she said she was in the hospital up here, I don't know the name of the hospital.

"Q. Doctor, what is traumatic neurosis?

"A. That is a disfunction of the nervous system caused by traumatic jar and injury.

"Q. Is it frequent that people lose their voices as a result of traumatic neurosis?

"A. Yes, sir.

"Q. Is that a real condition?

"A. It is a real condition, no matter what the cause is, this woman has lost her voice.

"Q. And did you say you found where the nerves come out of the spine, where it rotated, there was some disfunction there?

"A. Yes, sir, the laryngeal nerve comes off of the cervical plexus, and that vertebrae (*sic*) being rotated stretches the nerve and impinges and cuts off the nerve impulses.

"Q. Where does speech originate, where does the first impulse come from?

"A. It comes from the brain to begin with.

"Q. I will ask you whether or not the current that sets the speech in motion, if that nerve was injured, whether there could be speech?

"A. There could not be, because of disfunction."

Again, he testified:

"Q. In two or three months after she came to you it was your opinion her loss of voice was due to an impingement to the laryngeal nerve or to a traumatic neurosis; is that correct?

"A. I will say it was my opinion at that time her loss of voice was due to a traumatic neurosis.

"Q. Traumatic neurosis is sometimes called hysteria, isn't it?

"A. That is right."

When further pressed on cross-examination for an expression of opinion as to whether the plaintiff's loss of voice was due to an impingement on the laryngeal nerve or to traumatic neurosis, he replied: "I would judge it to be from the traumatism she suffered down here in the accident in 1953 probably. I am not certain about that."

Dr. Stuart did not, in so many words, testify that the plaintiff's loss of speech was caused solely by the injuries received in the train accident, but clearly that was the purport of, or the inference to be drawn from, his testimony. It will be observed that he did not in any way attribute it to, or associate it with, the injuries which she had received in the prior automobile accident.

Dr. Lawrence, a chiropractor, called as a witness for the plaintiff, testified that he had treated her since 1937. He saw her "a few weeks" before the train accident and found that no "spinal adjust-

ment" was necessary. When he saw her on November 16, 1953, about two weeks after the train accident, he found that there was a rotation to the right of the seventh cervical vertebra. He expressed the opinion that this misalignment caused an impingement on the nerve leading to the vocal cords and resulted in her loss of speech. He expressed the further opinion that she was at the time of the trial "totally and permanently disabled" from engaging in any gainful occupation. However, he said that since he was not a diagnostician he made no attempt to determine whether the plaintiff's condition was caused by the train accident.

Three physicians, called by the defendant, testified with respect to the plaintiff's loss of voice and the probable cause thereof. Dr. Johnston, a surgeon connected with the hospital to which the plaintiff was taken immediately after the train accident and who examined her on admission, testified that he found her suffering from a fracture of the left seventh rib, a fracture of the sternum, and contusions on the chin, neck and back. On the fourth day after her admission to the hospital she began to get hoarse; that condition became worse and soon she was unable to speak above a whisper. He diagnosed her case to be one of "hysterical aphonia." He further expressed the opinion that the train accident was not "the sole proximate cause" of the plaintiff's loss of voice, but that her condition was due to the combination of the injuries received in that and the prior automobile accident. He said that as the result of the first accident the plaintiff was suffering from an "abnormal mental condition" and that the train accident "in effect triggered her condition" and produced a hysterical loss of voice.

When asked by the court, "Can you say with any degree of certainty or probability the hysterical condition arose from the prior accident twenty years ago, as distinguished from the accident in 1953?" his answer was, "The only honest answer I can give you is that I think this accident on the railroad triggered her condition. In other words, I think it was there, and it is true she was not having trouble with it, and if she had not gotten into a situation she couldn't handle she might have been all right; however, the accident did trigger this thing and she has it." He suggested that the plaintiff should seek psychiatric treatment.

Dr. Hayter, another witness for the defendant, testified that in the absence of any evidence of trauma or disease to the vocal cords, it was his opinion that the plaintiff's loss of voice was due to hys-

teria. When asked whether, in his opinion, the train accident was the sole cause of her hysteria his answer was that it was not. As he said, according to the plaintiff's history "she evidently sustained a very severe trauma or injury in an automobile accident some twenty years ago, and in my opinion that is the basic cause or beginning of this mental process which eventually led to hysterical reactions."

Dr. Myron, a throat specialist, testifying for the defendant, said that he found no evidence of trauma or disease which caused the plaintiff's loss of speech. He diagnosed her case as one of "hysterical aphonia." This physician further testified that he had previously seen cases of this character and found that they were usually associated with "a story of shock or some fright." Because he had found that such cases responded to psychiatric treatment he referred the plaintiff to a psychiatrist. Dr. Myron did not express any opinion as to whether the train accident was the sole cause of, or merely a contributing cause to, the plaintiff's disability.

In an instruction offered by the plaintiff the issue was submitted to the jury whether the train accident "was the sole proximate cause" of the plaintiff's disability. Again, in an instruction offered by the defendant, the jury were told that before the plaintiff could recover the benefits sued for she must prove by "the greater weight of the evidence that she has been wholly and continuously disabled solely as the result of the injuries which she received in the train accident, and that nothing else proximately caused or proximately contributed to such" disability. Since these instructions were not objected to they became the law of the case.

It will be observed from what has been said that evidence on this issue was in conflict. The testimony of Dr. Stuart supports the contention of the plaintiff, while that of Drs. Johnston and Hayter supports that of the defendant Insurance Company. The credibility of these medical experts was for the jury which have settled the conflict in favor of the plaintiff. The testimony of Dr. Stuart, coupled with that of the several lay witnesses that the plaintiff was in good health before the train accident and became disabled shortly thereafter, is sufficient to sustain the verdict. It is not within our province to substitute our finding for that of the jury.

The case before us is easily distinguishable from *Crowder* v. *General Accident, etc., Corp.*, 180 Va. 117, 21 S. E. 2d 772, cited by the Insurance Company. There we affirmed a judgment of the lower court based upon its finding that the plaintiff was not entitled

to disability benefits under a similar policy because the uncontradicted evidence showed that the disability was caused in part by disease as well as by injuries received in an accident. Cf. *Mutual Benefit, etc., Ass'n.* v. *Hite, supra* (184 Va. 614, 35 S. E. 2d 743), where we affirmed a judgment based upon a jury's finding upon conflicting evidence that the insured's loss of life resulted directly and independently of all other causes from bodily injuries sustained through accidental means.

Next it is urged that the trial court erred in not permitting Dr. Johnston to testify that the plaintiff failed and refused to follow his advice that she consult a psychiatrist for treatment for her loss of voice, and that such treatment would probably have improved or cured her condition. In this connection it is also urged that the court erred in not instructing the jury that such failure and refusal barred the plaintiff's right to recover the disability benefits sued for.

There is a conflict of authority as to whether, in the absence of a policy requirement, an insured has the duty to undergo medical treatment in order to lessen his disability. See 45 C. J. S., Insurance, § 939-i, pp. 1125, 1126; 29 Am. Jur., Insurance, § 1173, pp. 884, 885; Couch Cyclopedia of Insurance Law, 1945 Cum. Supp., Vol. II, § 1688-1, p. 2100 *ff.*; Annotation, 126 A. L. R. 136.

According to what seems to be the majority view, in the absence of a policy requirement, an insured need not attempt to minimize or lessen his disability by undergoing medical treatment. This is upon the principle that imposing such a requirement upon an insured would, in effect, enlarge the terms of the policy beyond the stipulations written therein by the insurance company. A clear exposition of this view is found in *Volunteer State Life Ins. Co.* v. *Weaver* (1936), 232 Ala. 224, 167 So. 268.

*Cody* v. *John Hancock Mut. Life Ins. Co.* (1932), 111 W. Va. 518, 163 S. E. 4, 86 A. L. R. 354, relied upon by the Insurance Company here, is the leading case among those taking the opposite view. There it was held that a person carrying disability insurance must, as a general rule, in order to minimize his existing disability, submit to any treatment to which a reasonably prudent person would submit.

It is unnecessary for us to decide here which rule we should adopt because the facts in the present case do not bring it within the principles laid down in the *Cody* case, invoked by the Insurance Company, that an insured who unreasonably refuses to undergo

medical treatment to better his condition is debarred from recovering disability benefits. In that case it was said: "The courts are in accord in the rule that in determining what constitutes reasonable or unreasonable refusal to submit to treatment, including minor surgical operations, to alleviate pain and suffering and improve one's condition, the facts of the particular case must govern." (163 S. E., at page 6.)

In the present case the trial court excluded this testimony of Dr. Johnston on two grounds. First, it said, there was no requirement in the policy that she seek medical treatment to cure or improve her condition; and second, it pointed out that she had already consulted "a dozen doctors," including "some of the finest physicians we have in this area." Obviously, in rejecting the evidence on the second ground the trial court took the view that under the circumstances the plaintiff's refusal to consult a psychiatrist was not unreasonable. We agree with this view.

While Drs. Johnston and Myron testified that they had known of good results from psychiatric treatments of persons suffering from hysteria, which they thought was the basis of the plaintiff's trouble, neither physician testified that he so advised the plaintiff, or that he told her that such treatment would probably benefit her. Dr. Johnston testified, in response to a question by the court, that he did not "insist" upon or urge her to take such treatment but merely "advised" her to do so. As he said, "She didn't want to do it, that she thought she would see how she got along and gave no inkling that she wouldn't do it." Dr. Myron merely testified that he "referred her" to Dr. Hogan, a local psychiatrist.

At the trial the plaintiff was not questioned at all about her failure to seek psychiatric treatment. She listed by name at least a dozen other physicians and specialists by whom she had been examined or treated.

[■] The trial court refused the instruction offered by the defendant on this phase of the case on the same grounds on which it excluded the testimony of Dr. Johnston. But aside from this, the instruction was not framed in accordance with the principles invoked by the defendant in the *Cody* case. It would have told the jury that if they believed from the evidence that the plaintiff was advised by competent physicians to obtain psychiatric treatment and "that she failed and refused" to follow such advice, then she was not entitled to recover the disability benefits sued for. As phrased, it did not

submit to the jury for their determination whether under the circumstances such refusal was reasonable or unreasonable.

■ Complaint is made of the refusal of the trial court to grant Instruction A-2, which would have told the jury that the burden was on the plaintiff to prove by the greater weight of the evidence that "she has been disabled solely as a result of the injuries she received in the train accident, that nothing else proximately caused or proximately contributed to such disability," and that if they believed from the evidence that at the time of the train accident "she already had *physical infirmities or* an abnormal mental condition resulting from the prior automobile accident, which proximately caused or proximately contributed to such disability" (italics supplied), she was not entitled to recover. The court refused to grant the instruction as submitted, but eliminated the italicized words and granted the remainder of the instruction as A-3.

There was no error in this ruling. As the trial court aptly pointed out, there was no evidence that at the time of the train accident the plaintiff had any "physical infirmities" which contributed to her disability; that the contention of the defendant was that the plaintiff's disability, that is, her loss of voice, was caused by the combination of her "abnormal mental condition" resulting from the automobile accident and the injuries sustained by her in the train accident. It is true that at the time of the train accident the plaintiff was undergoing treatment for laryngitis, but there is no evidence that this condition caused or contributed to her loss of voice. Hence, Instruction A-3 fairly and fully submitted to the jury the defendant's theory of the case.

On the whole we find no merit in any of the defendant's contentions and the judgment is

*Affirmed.*